IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>TIMOTHY M. MCGINN,<br>DAVID L. SMITH,<br><br>Defendants. | Case No. 12-CR-028 (DNH)<br><br>TRIAL MEMORANDUM |

## <u>STATEMENT OF THE CASE</u>

On October 11, 2012, defendant Timothy M. McGinn and David L. Smith were charged in a superseding indictment with the following offenses: one count of conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349 (count 1); nine counts of mail fraud, in violation of 18 U.S.C. § 1341 (counts 2-10); ten counts of wire fraud, in violation of 18 U.S.C. § 1343 (counts 11-20); and six counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5 (counts 21-26).  In addition, each of the defendants was also charged with three counts of filing a false income tax return, in violation of 26 U.S.C. § 7206(1) (counts 27 - 29 for defendant McGinn and counts 30-32 for defendant Smith).  The superseding indictment also contains a forfeiture allegation seeking a money judgment of $8,000,000 related to the conspiracy and fraud counts.

## II.  FACTUAL BACKGROUND

### A.  The Broker-Dealer and Related Entities

During the relevant time period – September 2006 through December 2009 – McGinn, Smith & Co., Inc., (the "broker-dealer") was a broker-dealer registered with the Securities and Exchange Commission ("SEC").  Its headquarters was in Albany, New York, and it also had  offices in Clifton Park, and New York, New York.

The broker-dealer offered its approximately 2,000 customers many types of investment services.  Defendants were also involved in the creation and sale of unregistered securities pursuant to Regulation D of the Securities Act of 1933, 17 C.F.R. § 230.500 *et seq.*  Sales of these unregistered securities were generally limited to certain types of investors including individuals who met minimum net worth and income requirements.  As part of the sales process, the broker-dealer provided investors  private placement memoranda ("PPMs") describing the unregistered securities.

Although defendants owned and controlled a large number of entities related to the broker-dealer and made many offerings, only a few are relevant to the charges. Specifically, the superseding indictment involve three different types of securities sold by the broker-dealer: (1) contract certificates offered by 17 trusts (the "Trusts"); (2) participating notes offered by McGinn Smith Transaction Funding Corp. ("MSTF"), and (3) secured notes offered by four limited liability companies (the "Four Funds").   The superseding indictment also involves five limited liability companies created by defendants between 2006 and 2009 (the "LLCs").

2

1.    __The Trusts__

Between October 2006 and July 2009, defendants used one of their companies, McGinn, Smith Capital Holdings, Corp. to create the Trusts and then used the broker-dealer to sell approximately $37 million of unregistered securities to investors in the form of contract certificates.

As direct and indirect owners of the trustee for the Trusts, defendants owed a fiduciary duty to investors.  With the exception of TDM Cable Trust 06, the declarations of trust for all of the Trusts, which were attached to the PPMs, limited the use of investor money to the direct or indirect acquisition of revenue streams created by the Agreements. To the extent that investor money was not used to acquire a revenue stream, the Trusts restricted the use of investor money to (1) certificates of deposit; (2) short term AAA rated debt obligations regularly traded on a recognized exchange in the United States; or (3) obligations issued by the United States Treasury or other obligations backed by the full force and credit of the United States (the "Permitted Investments").

According to the PPMs prepared for the offering and sale of these investments in the Trusts, after deducting fees and other deal costs, such as underwriting fees, investor money would be provided to one of the LLCs or MSTF, which had entered into or would enter into an agreement with a third party requiring payments from the third party.  Those agreements were related to (a) burglar alarm, broadband, cable, and telephone services; (b) loans to companies providing those services; (c) guaranteed payment units (scheduled payments) from an entity providing capital to companies providing those services; and (d) luxury cruise charters and travel agencies (the "Agreements").

According to the PPMs, investors would receive principal and interest payments

ranging from 7.75% to 13% over twelve to sixty-six months from the purchased income streams.[1]   In addition, the PPMs disclosed that the broker-dealer would receive approximately $2.2 million in underwriting fees from the Trusts.  In reality, between in or about 2006 and 2009, the broker-dealer received more than $6 million in connection with transactions related to the Trusts, of which approximately $1.8 million was paid directly from the Trusts and booked as underwriting fees.  Approximately 80% of the more than $6 million paid to the broker-dealer consisted of investor money.

> ### 2.   MSTF

Defendants controlled MSTF through another limited liability company.   As direct and indirect owners of MSTF, defendants owed a fiduciary duty to investors.

Between May 2, 2008 and November 26, 2008, the broker-dealer raised approximately $6.8 million from investors for MSTF.  According to the PPM for MSTF, investor money would be used to (a) provide capital to close financial transactions originated by the broker-dealer; (b) invest in other public and private securities; and (c) purchase $1.5 million of the broker-dealer's 2008 Series Cumulative Preferred Stock.

> ### 3.   The Four Funds

Defendants controlled the Four Funds – First Independent Income Notes, LLC ("FIIN"), First Excelsior Income Notes, LLC ("FEIN"), Third Albany Income Notes, LLC ("TAIN"), and First Advisory Income Notes, LLC ("FAIN") – through another limited liability

---

[1]When there were two classes of contract certificates – the senior and junior classes – the senior certificates offered a lower interest rate and a higher priority of repayment, while the junior certificates offered a higher interest rate and a lower priority of repayment.

company.   As direct and indirect owners of the trustee for the Four Funds, defendants owed a fiduciary duty to investors.

Between 2003 and 2005, the broker-dealer raised more than $90 million from investors for the Four Funds.   By December 2, 2007, the investments held by the Four Funds were worth approximately $49 million less than the amount owed to investors and, as a result, during 2008, interest payments to some investors were cut, while interest payments to other investors were suspended.

**B.      The Improper Diversion of $998,000 from MSTF and Three of the Four Funds and Related False Accounting Entries.**

In approximately May 2008, defendant McGinn identified his best clients whose investments in, among other things, the Four Funds, would no longer be paying them as much as they had been promised, and he decided to continue to pay them by improperly diverting money from unrelated entities.   Between  May 15, 2008 and July 8, 2009, defendant McGinn improperly diverted more than $473,000 from an escrow account holding investor funds for MSTF to pay the preferred clients.   None of the preferred clients who received the improperly diverted funds were MSTF investors.

In November 2008 and April 2009, the broker-dealer did not have sufficient funds available to pay its employees, and defendants improperly diverted $525,000 from three of the Four Funds to pay the broker-dealer's employees.   They also improperly used MSTF to conceal and disguise the true nature of these transactions by passing the money from three of the Four Funds through MSTF and then to the broker-dealer.

Both defendants concealed, disguised, and failed to disclose these improper diversions to investors.   For example, from October 12, 2009 through April 2010,

defendants misled the broker-dealer's regulator, Financial Industry Regulatory Authority, Inc. ("FINRA"), about the diversions for the preferred clients and the payroll diversions. In response to a September 30, 2009 document request from FINRA, defendants directed the creation of false accounting entries to conceal the true nature of these transactions and caused the submission of these false accounting entries to FINRA.

## C.  Defendants Divert $4.1 Million for Their Benefit and the Benefit of Matthew Rogers, Direct False Accounting Entries, Fail to Pay Taxes on the Money, and Submit False Documents to FINRA.

Between October 2, 2006 and August 28, 2009, defendants, for their own benefit and the benefit of Matthew Rogers, a senior managing director of the broker-dealer, improperly diverted approximately $4.1 million above and beyond what was disclosed in the relevant PPMs for the Trusts and MSTF.   The improper diversions came from (1) the LLCs ($3.8 million); (2) Integrated Excellence Sr. Trust 08 ($85,000); (3) TDMM Cable Jr. Trust 09 ($30,000); and (4) McGinn, Smith Transaction Funding Corp. ("MSTF") ($230,000).[2]  McGinn received approximately $1,616,142 (approximately $1,386,142 of which was related to the Trusts), and Smith received approximately $1,567,000.

Defendants and Rogers did not declare any of the improperly diverted money on their income tax returns for 2006, 2007, and 2008.  Defendants are expected to claim during the trial that they were not required to report the money as income because the transactions were "loans."   The evidence does not support their position.   The first improper diversions were accurately booked as "fees," and defendant Smith himself described the money as "other income" to his accountant.  In addition, none of the typical

---

[2]This money went directly to defendant McGinn, and in 2009, he paid back $100,000.

documentation regarding a legitimate loan was present: there was no date set for repayment, no repayment schedule, no promissory note, no security, no charged interest, and no paid interest.  Despite the reality of the transactions, in October 2007, defendant Smith directed accountants at the broker-dealer and an outside accounting firm to reclassify transactions regarding money improperly diverted in 2006 from TDM Cable Funding, LLC to the personal bank accounts of defendants and Rogers from "fees" to "loans."

Defendants continued to divert investor money through 2009 and, at the direction of defendants, accountants at the broker-dealer continued to book the money that had been improperly diverted from the LLCs as "loans."  The typical documentation regarding a legitimate loan was not present for any of these transactions: there was no date set for repayment, no repayment schedule, no promissory note, no security, no charged interest, and no paid interest.  In addition, defendants did not disclose any of the improperly diverted money as "loans" on personal financial statements prepared by their accountant in November 2008 and the spring of 2009.   In fact, defendant McGinn characterized the money he received in 2007 as income in connection with a mortgage application.

In the fall of 2009, when FINRA discovered inconsistent accounting entries regarding the improperly diverted money and asked for information, defendants directed the creation of backdated promissory notes to support the false "loan" accounting entries discovered by FINRA .  Defendants also caused the newly created promissory notes to be sent to FINRA.

In addition, on November 2, 2009, after discovering that defendant McGinn had improperly diverted money from MSTF, defendant Smith directed an accountant for the

broker-dealer to make a false accounting entry indicating that MCGINN had taken $130,000 from NEI Capital LLC.   The reason for this false accounting entry was to conceal the source of the diverted funds.

**D.**     **Defendants Fail to Disclose to Investors in the Firstline Trusts That the Borrower Had Filed Bankruptcy and That Investors Had Been and Would Be Paid with Money Improperly Diverted from Unrelated Entities.**

The Firstline Trusts – Firstline Trust 07, Firstline Sr. Trust 07, Firstline Trust 07 Series B, and Firstline Sr. Trust 07 Series B – were related to two loans made to Firstline Security, Inc. ("Firstline"), a Utah corporation which sold security alarm contracts: a  May 9, 2007 loan agreement of $2.8 million (the "May Loan") and an October 4, 2007 loan agreement of $2.4 million (the "October Loan").

Between   May 24, 2007, and January 4, 2008, the broker-dealer raised approximately $3.7 million from investors who purchased unregistered securities from Firstline Trust 07 and Firstline Sr. Trust 07 (the "Firstline Trusts") in return for monthly payments on their investments to be paid from the revenue stream produced by the May Loan.    Between October 29, 2007, and June 16, 2008, the broker-dealer raised approximately $3.2 million from investors who purchased unregistered securities from Firstline Trust 07 Series B and Firstline Sr. Trust 07 Series B (the "Firstline Series B Trusts") in return for monthly payments on their investments from the revenue stream produced by the October Loan.

In connection with these sales, defendants failed to disclose material information to investors.   First, they failed to disclose payments to themselves ($620,000 for the Firstline Trusts and $315,000 for the Firstline Series B Trusts) that were above and beyond

8

the fees disclosed to investors in the PPMs.   Second, by the time that the Firstline Series B Trusts were offered to investors, defendants were aware that Firstline had serious issues which could affect its ability to repay the loans.   Specifically, Firstline's dealer had informed Firstline that Firstline was in breach of its dealer agreement, and Firstline was anticipating that its dealer might file a law suit seeking more than $7.5 million in damages related to the breach.  Defendants did not disclose this potential litigation to any of the Firstline Trust and Firstline Series B Trust investors.

On November 20, 2007, while the broker-dealer was selling the Firstline Trust Series B contract certificates, the potential litigation became actual litigation.  Firstline's dealer filed a lawsuit in Arapahoe County, Colorado against Firstline, the broker-dealer, and others alleging that Firstline was in breach of the dealer agreement and seeking the appointment of a receiver for Firstline.  Defendants did not disclose this litigation to any of the existing or prospective investors in any of the Firstline Trust securities, and the broker-dealer continued to sell the Firstline Trust Series B securities.

Not surprisingly, the litigation had a negative effect on Firstline's business.   In January 2008, Firstline stopped making payments on the May Loan and failed to make its first payment on the October Loan.  Even worse, on January 25, 2008, Firstline filed a voluntary petition for Chapter 11 bankruptcy in United States Bankruptcy Court in the District of Utah.  After the bankruptcy, Firstline never made any additional payments on the loans, and there was no income stream to make payments to investors.

Defendants did not disclose the bankruptcy or the loan defaults to any of the existing or prospective Firstline Trust investors.  Instead, they lulled investors into believing that the loans were performing well by making approximately $2 million in payments

promised to investors.  They funded the lulling payments by diverting money from other trusts and entities unrelated to the four Firstline Trusts.  These diversions were not disclosed to any of the affected investors (those receiving the lulling payments or those whose income streams or money had been diverted to make the lulling payments).

Defendants also made approximately twenty post-bankruptcy sales of the Firstline Series B Trust.   Most of the post-bankruptcy sales were made to redeem a $600,000 investment by a broker's father.   They did not disclose any of the important information about Firstline to these new investors such as the bankruptcy, the loan defaults, the lulling payments, and the litigation.

On September 10, 2009, more than 19 months after Firstline filed for bankruptcy and defaulted on the May and October Loans, defendants finally told investors about the Firstline bankruptcy by mailing a memorandum from the general counsel for the broker-dealer.  The memorandum falsely stated that (1) post-bankruptcy investor payments had been funded by an unidentified lender when they had actually been funded by improper diversions and (2) Firstline had concealed the potential litigation with its dealer when, in reality, Firstline had actually disclosed that litigation approximately two years earlier.

E.      **Integrated Excellence**

Between June 9, 2008 and September 26, 2008, the broker-dealer raised approximately $1.2 million from investors who purchased unregistered securities from the Integrated Excellence Sr. Trust 08 and Integrated Excellence Jr. Trust 08 (the "Integrated Excellence Trusts") in return for monthly payments on their investments.  The investor payments were to be made from the revenue stream produced by loans made for the benefit of a company selling residential security alarm contracts, Integrated Excellence,

10

Inc.

On July 1, 2008 and on July 15, 2008, defendants, who were officers and owners of the trustee for Integrated Excellence Sr. Trust 08, improperly diverted a total of $85,000 from an escrow account holding investor funds for that trust to their personal bank accounts.   In addition, in August 2008, defendant McGinn directed that $142,000 be improperly diverted from an escrow account holding investor funds for that trust to make investor payments to Firstline Sr. Trust 07 investors and TDM Luxury Cruise Trust 07 investors.   Defendants never disclosed these diversions to any of the affected investors.

In addition, the loan payments made on the loans were not sufficient to cover payments to Integrated Excellence investors, and defendant McGinn directed that lulling payments be made to the investors by diverting money from other unrelated trusts and entities which defendants controlled.

### III.   LAW RELATED TO THE CHARGES IN THIS CASE

#### A.   Conspiracy to Commit Mail and Wire Fraud

Section 1349 states: "Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."   Section 1349 is in Chapter 23, and both mail and wire fraud are also in that chapter.

In order to satisfy its burden of proof, the government must establish (1) that two or persons entered into a joint enterprise to commit mail or wire fraud  (2) with awareness of its general nature and extent.   *United States v. Mahaffy*, 499 F. Supp. 2d 291 (E.D.N.Y. 2007); *see also  United States v. Torres*, 604 F.3d 58, 65 (2d Cir. 2010) (drug conspiracy

statute).  Like the RICO conspiracy, drug conspiracy, and money laundering statutes, this statute does not require proof of an overt act.  *United States v. Chinasa*, 789 F. Supp.2d 691, (E.D.Va. 2011); *United States v. Williams*, 2011 WL 5009516 (D. Md. Oct. 20, 2011); *United States v. Albers*, 2011 WL 1225548 (E.D.N.Y. 2011) (unpublished opinion) (same); *United States v. Ellis*, 2011 WL 3793679 (S.D. Tx. 2011) (unpublished opinion); *United States v. Stroll*, 2010 WL 5313486 (S.D. Fla. 2010) (unpublished opinion); *United States v. Berger*, 2010 WL 4237925 (W.D. Pa. 2010), *but see United States Osuji*, 413 Fed. Appx. 603, 605-06 (4th Cir 2011) (unpublished opinion) (including overt act as an element of conspiracy where § 1349 and money laundering conspiracy were charged despite the fact that neither requires proof of an overt act); *United States v. Obilo*, 408 Fed. Appx. 698, 699-700 (4th Cir. 2011) (unpublished per curiam opinion) (quoting *Osuji* where both § 1349 and § 371 had been charged) (both of these decisions rely on *United States v. Hedgepeth*, 418 F.3d 411, 420 (4th Cir. 2005) which was a § 371 case); *United States v. Reed*, 350 Fed. Appx. 675 (3d Cir. 2009) (unpublished opinion); *United States v. Fumo*, 2008 WL 1731911 (E.D. Pa. 2008) (unpublished opinion) (citing a § 371 case); *United States v. Mitan*, 2009 WL 1651288 (E.D. Pa. 2009) (unpublished opinion).

The government nevertheless requests that the Court instruct the jury that it is required to find an overt act because the Second Circuit recently suggested in *dicta* that proof of an overt act may be required.  *See United States v. Mahaffy*, 693 F.3d 113 (2d Cir. 2012) ("To prove conspiracy, the government must show that the defendant agreed with another to commit the offense; that he knowingly engaged in the conspiracy with the specific intent to commit the offenses that were the objects of the conspiracy; and that an

overt act in furtherance of the conspiracy was committed.") (citing *United States v. Monaco*, 194 F.3d 381, 386 (2d Cir.1999), a conspiracy to commit money laundering case prosecuted before Section 1349 was enacted) (quotation marks omitted).  If the defendants are convicted, then the government will argue on appeal that no overt act is required, but no retrial would be required if the Second Circuit disagreed.

The following passage, taken from a Second Circuit decision affirming, among other things, a conviction for a conspiracy, summarizes the governing law:

> " 'A conspiracy need not be shown by proof of an explicit agreement but can be established by showing that the parties have a tacit understanding to carry out the prohibited conduct.' " *United States v. Samaria*, 239 F.3d 228, 234 (2d Cir. 2001) (quotation omitted).[3]  In either case, "the evidence must be sufficient to permit the jury to infer that the defendant and other alleged coconspirators entered into a joint enterprise with consciousness of its general nature and extent." *Beech-Nut Nutrition Corp.*, 871 F.2d at 1191 (citing *United States v. Alessi*, 638 F.2d 466, 473 (2d Cir.1980)).
>
> Conspiracies are secretive by their very nature, and it is thus well-settled that the elements of a conspiracy may be proved by circumstantial evidence.  *See Samaria*, 239 F.3d at 234 (citation omitted); *see also United States v. Desena*, 260 F.3d 150, 154 (2d Cir. 2001) ("The elements of a conspiracy may be proved by circumstantial evidence.") (citation omitted).
>
> In certain conspiracy prosecutions, the Government often seeks to prove that a particular defendant joined a preexisting conspiracy.  *See*, *e.g.*, *United States v. Reyes*, 302 F.3d 48, 53 (2d Cir. 2002); *United States v. Ciambrone*, 787 F.2d 799, 806 (2d Cir.1986).  In other cases, the question is whether a conspiracy existed at all and, if so, whether a particular defendant was a party to the alleged conspiratorial agreement.  *See*, *e.g.*, *Beech-Nut Nutrition Corp.*, 871 F.2d at 1191-93 (discussing evidence of single versus multiple conspiracies); *United States v. Gaviria*, 740 F.2d 174, 183 (2d Cir. 1984).  Of course, the nature of the evidence used to establish the existence of a

---

[3]  *Samaria* also stood for the proposition that "once a conspiracy is shown to exist, the evidence sufficient to link another defendant to it need not be overwhelming," 239 F.3d at 234, which another panel of the Second Circuit later rejected in *United States v. Huezo*, 546 F.3d 174, 180 n.2 (2d Cir. 2008).

conspiratorial agreement may vary slightly, depending on the circumstances of the case. In the case of a preexisting conspiracy, the critical evidentiary question is often whether the defendant joined in the charged conspiracy (1) with some knowledge of the conspiracy's unlawful aims and (2) with the intent of helping the scheme succeed.  *See Reyes*, 302 F.3d at 53 (citations omitted).  In other cases, the evidentiary question is frequently whether there is proof that the defendant (1) had knowledge of the unlawful aims of the charged scheme and (2) evinced, by his actions, an intention to further or promote its unlawful aims.  *See Beech-Nut Nutrition Corp.*, 871 F.2d at 1191 (a conspiratorial agreement may be inferred where there is "'some indication that the defendant knew of and intended to further the illegal venture'") (quoting *United States v. Zambrano*, 776 F.2d 1091, 1095 (2d Cir. 1985)). The difference is not one of legal substance but only of evidentiary emphasis depending on the circumstances of the case.   In either case, the fundamental legal question is the same: whether the evidence establishes beyond a reasonable doubt that a particular defendant entered into an agreement with others with knowledge of the criminal purpose of the scheme and with the specific intent to aid in the accomplishment of those unlawful ends.

*United States v. Svoboda*, 347 F.3d 471, 477 (2d Cir. 2003).

This charged conspiracy had two objects: mail fraud and wire fraud.  Each of those crimes is discussed below.

**B.**    **Mail and Wire Fraud: 18 U.S.C. §§ 1341 and 1343**

Title 18, United States Code, Section 1341 provides in part that:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . .  for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both. . . .

Title 18, United States Code, Section 1343 provides in part that:

14

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. . . .

According to the Second Circuit, the "essential elements of a mail or wire fraud violation are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." *See*, *e.g.*, *United States v. Shellef*, 507 F.3d 82, 107 (2d Cir. 2007) (quoting *Fountain v. United States*, 357 F.3d 250, 255 (2d Cir. 2004)).   The Second Circuit uses this three-element form rather than a different three-element form used in *Modern Federal Jury Instructions*, ¶ 44:01, Instr. 44-3 (Elements of the Offense) as stated in the third paragraph of the comment.

Because the mail and wire fraud statutes use identical language, the Second Circuit "analyze[s] them the same way." *Shellef*, 507 F.3d at 107; *see also United States v. Carlo*, 507 F.3d 799, 801 n.1 (2d Cir. 2007) (noting that analysis of requirements of mail fraud and is identical to that for wire fraud).

### 1.   <u>Scheme to Defraud</u>

For the first element, the government is "required to prove (i) the existence of a scheme to defraud, (ii) fraudulent intent on the part of the defendant, and (iii) the materiality of the misrepresentations." *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000).   The Second Circuit has held that the first element "focuses on the intent to harm" through fraud, not the act of committing fraud. *United States v. Ramirez*, 420 F.3d 134, 143 (2d Cir. 2005).

15

"The fraud statutes are violated by affirmative misrepresentations or by omissions of material information that the defendant has a duty to disclose."  *Autuori,* 212 F.3d at 118.  *See also Neder*, 527 U.S. at 22 ("The Government does not dispute . . . that the well-settled meaning of 'fraud' required a misrepresentation or concealment of material fact."). "[It] is just as unlawful to speak 'half truths' or to omit to state facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading."  *Autuori*, 212 F.3d at 118.

A duty to disclose arises from a fiduciary or other similar relation of trust and confidence between the parties to a transaction. *United States v. Szur*, 289 F.3d 200, 210 (2d Cir. 2002).  "The common law has recognized that some associations are inherently fiduciary. Counted among these hornbook fiduciary relations are those existing between . . . trustee and trust beneficiary, and senior corporate official and shareholder.").  *See also Pepper v. Litton*, 308 U.S. 295, 306 (1939) ("A director is a fiduciary.  So is a dominant or controlling stockholder or group of stockholders.  Their powers are powers in trust.  Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein."); *Norlin Corp. v. Rooney, Pace Inc.*, 744 F.2d 255, 264 (2d Cir. 1984) ("the duty of loyalty, derives from the prohibition against self-dealing that inheres in the fiduciary relationship") (citing *Pepper*, 308 U.S. at 306-07).

"[T]he concealment by a fiduciary of material information which he is under a duty

16

to disclose to another under circumstances where the non-disclosure could or does result in harm to the other is a violation of the [mail fraud] statute." *See United States v. Altman*, 48 F.3d 96, 102 (2d Cir. 1995) (quoting *United States v. Bronston*, 658 F.2d 920, 926 (2d Cir. 1981)).

"It is a general rule that the intentional conversion of funds held in a fiduciary capacity to the personal use of the fiduciary is a fraud upon those for whom the funds are held." *United States v. Altman*, 48 F.3d 96, 101-02 (2d Cir. 1995) (citing *United States v. Buckner*, 108 F.2d 921, 926 (2d Cir. 1940)).   Any loans from a trust are thefts because a trustee may not lend himself money from a trust.  *See United States v. Young*, 955 F.2d 99, 103 (1st Cir. 1992) (embezzlement and mail fraud convictions where lawyer administered Veterans' Administration funds as a guardian for a disabled World War II veteran and "clearly violated his fiduciary obligations.") (citing *In re Estate of Stowell*, 595 A.2d 1022, 1025 (Me.1991) (fiduciary may not lend to himself); *Attorney General v. Flynn*, 331 Mass. 413, 120 N.E.2d 296, 302 (1954) (same); *Attorney Grievance Comm'n v. Pattison*, 292 Md. 599, 441 A.2d 328, 332 (1982) ("fiduciary may not make a loan, secured or unsecured, unto himself"); Restatement (Second) of Trusts § 170(1), comment 1, at 369 (1959) (trustee cannot "lend trust money to himself"); 2A Austin W. Scott & William F. Fratcher, *The Law of Trusts* § 170.17, at 385-86 (4th ed. 1987) ("trustee cannot properly lend trust funds to himself. This is true even though by the terms of the trust he is given the widest powers of investment.")).

### 2.   Money and Property

The contemplated harm to the interests of the victim must involve money or

17

property.   *United States v. Dinome*, 86 F.3d 277, 283 n.5 (2d Cir. 1985).   But the government "need not show that 'direct, tangible economic loss resulted to the scheme's intended victims.'"   *United States v. Weiss*, 752 F.2d 777, 784 (2d Cir. 1984) (quoting *United States v. Newman*, 664 F.2d 12 (2d Cir. 1981)).

### 3. <u>Use of Mail and Wires</u>

Defendants have offered to stipulate that they caused the requisite mailings and use of the wires in this case, but intend reserve any argument that the mailings and wires were not in furtherance of the scheme to defraud.   A mailing or wire transmission is in furtherance of a scheme to defraud when it is incidental to an essential part of the scheme, or a step in the plot.   *United States v. Reifler*, 446 F.3d 65, 96 (2d Cir. 2006).

Lulling letters may further a fraudulent scheme.   *See United States v. Young*, 955 F.2d 99, 108 (1st Cir. 1992) ("The jury could readily find that the letters deliberately created false impressions in the mind of the reader, and they were therefore 'part of the execution of the scheme as conceived . . . at the time' they were written, even though they later may have returned "' to haunt the perpetrator of the fraud.'") (quoting *Schmuck v. United States*, 489 U.S. 705, 715 (1989)).

### C. <u>Securities Fraud</u>

The sale of securities is regulated by the Securities Act of 1933 and the Securities Exchange Act of 1934 (the "1933 and 1934 Acts") and rules promulgated by the Securities and Exchange Commission under those acts.   Both statutes are broadly interpreted because they were designed to protect investors:

> The proscriptions of Section 78j(b) and Rule 10b-5 "are broad and, by repeated use of the word 'any,' are obviously meant to

> be inclusive. The Court has said that the 1934 Act and its companion legislative enactments (footnote omitted) embrace a 'fundamental purpose . . . to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry.' *SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 186 (1963).  In the case just cited the court noted that Congress intended securities legislation enacted for the purpose of avoiding frauds to be construed 'not technically and restrictively, but flexibly to effectuate its remedial purposes.' *Id.* at 195.    This was recently said once again in *Superintendent of Insurance v. Bankers Life and Casualty Co.*, 404 U.S. 6, 12 (1971).

*Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151 (1972).

Title 15, United States Code, Section 78j(b) provides in pertinent part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b-5,  17 C.F.R. § 240-10-b-5, states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud,  (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

Willful violations of the 1934 Act are criminal:

19

> Any person who willfully violates any provision of this chapter
> or any rule or regulation thereunder the violation of which is
> made unlawful or the observance of which is required under
> the terms of this chapter . . . shall upon conviction be fined not
> more than $5,000,000, or imprisoned not more than 20 years,
> or both . . . .

The elements are that: (1) in connection with the purchase or sale of a security, the defendant did any one or more of the following: (a) employed a device, scheme, or artifice to defraud; or (b) made an untrue statement of a material fact, or omitted to state a material fact which made what was said, under the circumstances, misleading; or (c) engaged in an act, practice, or course of business that operated, or would operate, as a fraud and deceit on any person; (2) the defendant acted willfully, knowingly and with the intent to defraud; (3) the defendant knowingly used or caused to be used, any means or instruments of transportation or communication in interstate commerce or the use of the mails in furtherance of the fraudulent conduct.   Sand, *Modern Federal Jury Instructions,* ¶57:03, Instr. 57-20.

Defendants have offered to stipulate that they used or caused to be used any means or instrumentality of interstate commerce or of the mails as alleged in counts 21-26.  The defendants reserve their ability to argue that the transactions were in furtherance of the fraudulent conduct.

**D.**   **Filing False Returns**

Each of the defendants is charged with three counts of filing false tax returns related to his 2006, 2007, and 2008 returns (counts 27-30 for McGinn and counts 30-32 for Smith). The elements are that the defendant: "(1) made or caused to be made, a federal income tax return for the year in question which he verified to be true; (2) that the tax return was false as to a material matter; (3) that the defendant signed the return willfully and knowing

20

it was false; and (4) the return contained a written declaration that it was made under the penalty of perjury." *United States v. Laspina*, 299 F.3d 165, 179 (2d Cir. 2002) (quoting *United States v. Pirro*, 212 F.3d 86, 89 (2d Cir. 2000)). "A false statement is material when it has the potential for hindering the IRS's efforts to monitor and verify the tax liability of a taxpayer." *Pirro*, 212 F.3d at 89 (quotations omitted).

### 1.   Relevant Law Regarding Whether a Loan is Legitimate

As detailed in the government's proposed jury instruction number 81, the Internal Revenue Code does not require a taxpayer to report a legitimate loan as income, but if the loan is not legitimate, then the taxpayer must report the money received as income. *See United States v. Pomponio*, 563 F.2d 659, 662 (4th Cir. 1977) (observing that it "is beyond argument" that "loans which are not actually such are income"); *United States v. Amick*, 2000 WL 1566351, at *4 (4th Cir. 2000) ("The district judge properly instructed the jury that it must determine if the transactions at issue were loans or income by determining whether [defendant] had an intention to repay the loans, and that it should consider 'all the evidence' in doing so."); *United States v. Swallow*, 511 F.2d 514, 519, 522 n.7 (10th Cir. 1975) ("[l]oans obtained in bad faith and without an intent to repay them" constitute income); *United States v. Rochelle*, 384 F.2d 748, 751 (5th Cir. 1967) ("Where the loans are obtained by fraud, and where it is apparent that the recipient recognizes no obligation to repay, the transaction becomes a 'wrongful appropriation and comes within the broad sweep of 'gross income.''").

The essential requirement for a legitimate, non-reportable loan is the taxpayer's own intention to repay at the time the money was received. *See United States v. Rosenthal*, 470 F.2d 837, 841 (2d Cir. 1972) (evidence sufficient for the jury to find that the defendant "knew he would not be able to, and that he did not intend to, repay the loans at the time

that he received the funds."); *Patrick v. Comm'r*, T.C. Memo 1998-30, 1998 WL 24194, at

*3 (Jan. 26, 1998) ("A transfer of money will be characterized as a loan for Federal income

tax purposes where 'at the time the funds were transferred, [there was] an unconditional

intention on the part of the transferee to repay the money, and an unconditional intention

on the part of the transferor to secure payment.'") (citations and quotations omitted).  *See*

*also Collins v. C.I.R.*, 3 F.3d 625, 631 (2d Cir. 1993) ("Loans are identified by the mutual

understanding between the borrower and lender of the obligation to repay and a *bona fide*

intent on the borrower's part to repay the acquired funds."); *Busch v. Comm'r of Internal*

*Rev.*, 728 F.2d 945, 948 (7th Cir. 1984) ("Whether withdrawals by a shareholder from a

corporation are treated for tax purposes as loans or dividends turns on whether, at the time

of the withdrawals, the taxpayer intended to repay them.");  *Pomponio*, 563 F.2d at 662

("[t]he sine qua non of a bona fide non-reportable loan is the taxpayer's own intention to

repay").

## 2.  <u>Advice of Accountant is Not a Defense</u>

A defendant may assert an advice-of-accountant defense only if he or she truthfully

and completely: (1) disclosed all relevant facts to the preparer or accountant, and; (2) in

good faith relied on the preparer's or accountant's advice.  *See United States v. Masat*,

948 F.2d 923, 930 (5th Cir. 1991); *United States v. Wilson*, 887 F.2d 69, 73 (5th Cir. 1989);

*United States v. Michaud*, 860 F.2d 495, 500 (1st Cir. 1988); *United States v. Samara*, 643

F.2d 701, 703-04 (10th Cir. 1981); *United States v. Pomponio*, 563 F.2d 659, 662 (4th Cir.

1977).

Although "there may be instances in which an accountant's interpretation of the tax

laws can justifiably be relied upon by a taxpayer, even if erroneous, certainly these cannot

include cases where the only real question bearing on the correctness of the returns, as

here, is one of the taxpayer's own intent." *United States v. Pomponio*, 563 F.2d 659, 662 (4th Cir. 1977) (internal citation omitted)).  Here, the defense does not apply because the critical issue is whether defendants intended, at the time that they received the money, to repay it.

Like the defendants in *Pomponio*, defendants "knew, at the time they signed their tax returns, whether they had received funds from their [LLC's] with the intention of repaying them." *Id.* at 662.  As a result, "[o]n the question of their own state of mind, a matter of fact, they can hardly claim reliance on their accountant, for it was incumbent upon them to inform [the accountant] that the advances were not loans if they had no intention of repayment." *Id.*  This is a natural corollary to the principle that a "'a taxpayer cannot shift the responsibility for admitted deficiencies to the accountants who prepared his returns if the taxpayer withholds vital information from his accountants . . . .'" *Id.* (quoting *United States v. Lisowski*, 504 F.2d 1268, 1272 (7th Cir. 1974); *United States v. Scher*, 476 F.2d 319, 321 (7th Cir. 1973)).

**E.    Forfeiture Allegations**

If the defendants are convicted of any of the counts alleging conspiracy or mail, wire or securities fraud, then the government will ask the Court to impose a $8 million money judgment.  Because the government is seeking only a money judgment and not forfeiture of specific assets, the Court, not the jury, will determine the amount of any money judgment that the defendant will be ordered to pay.  Fed. R. Crim. P. 32.2(b)(1)(A).  *See also United States v. Tedder*, 403 F.3d 836, 841 (7th Cir. 2005) (the defendant's right under Rule 32.2(b) is to have the jury determine if the Government has established the required nexus between the property and his crime; the rule does not give the defendant the right to have the jury determine the amount of a money judgment); *United States v.*

23

*Gregoire*, 638 F.3d 962, 972 (8th Cir. 2011)  (following *Tedder*).

The Court's determination may be based on evidence already in the record and on any additional evidence or information the parties submitted by the parties.  Fed. R. Crim. P.  32.2(b)(1)(B).  In addition, the Rules of Evidence do not apply in the forfeiture phase of the trial.  *See United States v. Ali*, 619 F.3d 713, 720 (7th Cir. 2010) (because forfeiture is part of sentencing, less stringent evidentiary standards apply in the forfeiture phase of the trial; "the evidence need only be 'reliable'"); *United States v. Capoccia*, 503 F.3d 103, 109 (2d Cir. 2007) (Rule 32.2(b)(1) allows the court to consider "evidence or information," making it clear that the court may consider hearsay; this is consistent with forfeiture being part of the sentencing process where hearsay is admissible).

The government must establish the amount of the money judgment by a preponderance of the evidence.  *See United States v. Martin*, 662 F.3d 301, 307 (4th Cir. 2011) ("The government must establish a nexus between the property for which it is seeking forfeiture and the crime by a preponderance of the evidence.").

A money judgment for the full amount of the property to be forfeited is appropriate following fraud convictions.  *United States v. Kalish*, 626 F.3d 165, 168-69 (2d Cir. 2010). The government does need not need to demonstrate either the traceability or the unavailability of the money identified in a forfeiture money judgment in order to obtain a money judgment.  *United States v. Awad,* 598 F.3d 76, 79 (2d Cir. 2010).  *See also Awad*, 598 F.3d at 79 (concluding that "criminal forfeiture need not be traced to identifiable assets in a defendant's possession"); *United States v. Connor*, 752 F.2d 566 (7th Cir. 1985) (en banc) (explaining that the forfeiture aspect of a criminal penalty is akin to a sanction against the person not an action against property).

In the event the directly forfeitable property is insufficient to satisfy the amount of

the money judgment, the government is entitled to the forfeiture of any other property of the defendant as substitute assets pursuant to 21 U.S.C. § 853(p).  The forfeiture of substitute assets is mandatory, *United States v. Alamoudi*, 452 F.3d 310, 314 (4th Cir. 2006), and there is no right to have a jury determine the forfeitability of substitute assets. *Id.*

## IV.  EVIDENTIARY ISSUES

### A.    Summary Witnesses and Summary Charts

The government will introduce charts, summaries, and calculations based on the evidence pursuant to Fed. R. Evid. 1006.   That rule allows the use of "a summary, chart, or calculation to prove the content of voluminous writings . . . that cannot be conveniently examined in court."  Fed. R. Evid. 1006.   *See, e.g., United States v. Yousef*, 327 F.3d 156, 157-58 (2d Cir. 2003) (upholding use of summary charts "because the Government was . . . entirely within its rights to use charts to draw the jurors' attention to particular evidence culled from a voluminous set of records").

"[C]harts may be introduced either through a person who prepared the chart or a person who has reviewed the underlying documents and confirmed the accuracy of the chart." *United States v. Bertoli*, 854 F.Supp. 975, 1055 (D.N.J. 1994), *aff'd in part and vacated and remanded for resentencing*, 40 F.3d 1384, *aff'd* 74 F.3d 1228 (3d Cir. 1995). Here, the government will introduce summary charts through witnesses "familiar with the underlying documents and how the charts were prepared."  *Id.* at 1055.

As required by the rule, the United States has provided the defendants with copies of the documents supporting these charts and those copies will be available during trial. In addition, most of these charts, summaries, and calculations have previously been made available to the defense, and, to the extent that they are revised or new ones are created,

25

the government will provide them immediately.

Retired IRS Special Agent Alyssa Daversa will also testify about summary charts that she has prepared in connection with the case.  In order to present this case in an orderly fashion to the jury, the United States will call Ms. Daversa twice during its case-in-chief.  When Ms. Daversa is first called to testify she will testify about the portion of the case involving the tax charges.  She will be recalled at the end of the government's case-in-chief to testify about other subjects in the case including the Firstline and Integrated Excellence Trusts.

Fed. R. 611(a) gives the court control over the presentation of evidence in order to: "(1) make those procedures effective for determining the truth; (2) avoid wasting time, and (3) protect witnesses from harassment or undue embarrassment."   A government agent may be recalled during the government's case-in-chief.  *See  United States v. Jackson*, 549 F.2d 517, 529 (8th Cir. 1977) (commending district court's decision to allow government agent to be recalled repeatedly to testify about individual narcotics transactions in chronological order "as one way to clearly present an organized factual recital in an extended conspiracy trial").  Here, allowing Ms.  Daversa to testify initially about the money improperly diverted for the personal benefit of defendants immediately following the other evidence presented regarding those charges, and allowing her to be recalled to testify about the other charges at the end of the trial is an effective means to avoid confusion in presenting the facts to the jury.

**B.**     **Admissibility of Documents**

The United States plans to introduce several different types of documents including bank records, other business records, public records, and court records.

**1.**       **Potential Stipulation**

26

Defendants had indicated a willingness to stipulate to the authenticity and admissibility of some of these categories of records, such as bank records, but they have not yet responded to our proposed stipulation.  If defendants do not stipulate to the admissibility and authenticity of records, then the United States will modify its witness list to add the relevant custodians of records and provide the Court with relevant law regarding those records.

## 2. <u>Admissibility of Documents Prepared by Attorneys and Testimony Of Attorneys</u>

The United States will elicit testimony from several attorney including the in-house counsel for the broker-dealer, Joseph Carr, and the following attorneys who represented the broker-dealer while they worked for Gersten Savage LLP: Cheryl Calugio, David Danovitch, Jay Kaplowitz, Eric Roper, and Robert Wolf.   In addition, the United States will offer documents prepared for and by attorneys.  Although some of the documents have legends suggesting that they are privileged, none of the documents are protected by any valid privilege.

Mr. Carr and the Gersten Savage attorneys did not represent defendants McGinn and Smith in their personal capacity in relation to any of the allegations in the superseding indictment, and the court-appointed receiver for the broker-dealer, William Brown, has decided not to assert any privileges held by the broker-dealer or any other of the McGinn Smith entities.[4]  Although no additional waivers were necessary, defendants McGinn and Smith have agreed to a limited waiver of any potential privileges that they may somehow

---

[4]Since April 20, 2010, William J. Brown, Esq. has acted as the receiver for the broker-dealer and more than 80 related entities including the entities relevant to the indictment.   He was appointed receiver by the United States Magistrate Judge David R. Homer in *SEC v. McGinn, Smith & Co., Inc., et. al.*, 1:10-cv-00457 (GLS/CFH).

have with both Mr. Carr and the Gersten Savage attorneys.  The limited waiver does not apply to any purely personal matters completely unrelated to any of the businesses.

As a result of the receiver's decision not to assert any potential privileges and the defendants' limited waiver, there are no privileges preventing the testimony of Mr. Carr and the Gersten Savage attorneys regarding the allegations in the superseding indictment. To the extent that the jury may have questions about why it is seeing documents marked with privilege legends, the United States respectfully requests that the Court instruct the jury that they should not be concerned about any privileges because the Court has addressed those legal issues.

## C.   Expert Testimony

The government intends to offer the testimony of IRS Partnership Technical Advisor Dianne Adelberg.  Based upon her experience and training, she will testify about several areas including (1) the types of books and records normally maintained for transactions taxpayers claim to be loans, (2) the IRS's requirements for documentation of transactions taxpayers claim to be loans, (3) the calculation of taxes owed by defendants as a result of their failure to declare millions of dollars on their income tax returns.   She may also opine that the transactions identified in paragraph 55 of the superseding indictment are not bona fide loans because of a lack of supporting documentation.  The United States has provided the defense with a summary of her qualifications and notice about these areas as testimony.

The government also intends to offer the testimony of IRS Special Agent Douglas A. Miller who has conducted the forensic examination of electronic evidence seized pursuant to the search warrants.   Based upon his experience and training, SA Miller will testify about several areas including (1) the processing of electronic evidence during the

execution of the search warrants, (2) the extraction of electronic evidence from computers and other media seized during the execution of the search warrants including the nature of the examinations that he undertook of the electronic evidence and the methods and/or software used to assist him in the examinations, and (3) the identification of creation and modification dates for documents including the backdated promissory notes.   The United States does not anticipate eliciting expert testimony from SA Miller during its case-in-chief, but has provided the defense with a copy of his curriculum vitae in case the Court determines that some portion of his testimony requires him to be qualified as an expert.

**D.**     **Evidence of Acts Which are "Intrinsic" Evidence**

At trial, the government intends to offer evidence of inculpatory statements made by defendants directly related to the charges in the superseding indictment.     Such evidence if intrinsic or "intricately related to the facts of the case," is not subject to analysis under Fed. R. Evid. 404(b) because it is directly probative of intent.    *United States v. Hilgeford*, 7 F. 3d 1340, 1345-46 (7th Cir. 1993); *see also United States v. Williams*, 900 F.2d 823, 825 (5th Cir. 1990) (other act evidence is "intrinsic" and therefore not governed by Rule 404(b) when the evidence of the other acts and the evidence of the crime charged are "inextricably intertwined," both acts are part of a "single criminal episode," or the other acts were "necessary preliminaries" to the crime charged).

For example, an October 10, 2009 handwritten memorandum from defendants to Gersten Savage LLP attorney Jay Kaplowitz –   in which they confess to the improper diversion of nearly $ 1 million and propose making false accounting entries to conceal their actions – is direct evidence of the crimes.   The letter is also relevant evidence on the issue of intent regarding the later creation of the false accounting entries and the submission of the false accounting entries to FINRA.   It is also necessary background for the jury to

understand Mr. Kaplowitz's anticipated testimony about his response to the letter.

Another example is a handwritten letter from Smith to McGinn found at Smith's Saratoga Springs home.  The letter is not dated, but references in the letter suggest that it was written in early 2000.  In the letter, Smith indicated that he was worried about criminal prosecution and explained that they knew that they did not have enough money to pay investors:

> I believe that we are at risk for the continual raising of investment dollars that are now clearly unlikely to be repaid in full.  As we do each transaction we distribute every excess dollar back to C4 or McGinn, Smith/MS partners. More recently, those dollars for the most part are used to fulfill the investment promise to earlier investors.  While you have previously rejected my characterization of these acts as similar to a "Ponzi Scheme" because new dollars being raised are in fact layering buying new product, and only "profit dollars" are being used to cover shortfalls, I believe that our actions could be defined otherwise.  The reason for my belief is that we are now in possession of indisbutable (sic) empirical evidence that the new investments have no chance of being repaid in full.
>
> * * *
>
> Therefore, our "profits" which we use are not profits at all, but rather monies that should be held in reserve to allow for the deficit collections for the protection of the new investors.  For us not to allow for these deficits by setting up adequate reserves is, in my judgement (sic) , bordering on fraud. Certainly, by not disclosing in the prospectus our poor history of collections, we are not providing the prospective investor an accurate picture of his risk. W both know why we did not make that disclosure-because such disclosure would cause our salesman to cease selling and investors to cease buying. Thus, we are both misleading both our employees and customers.
>
> * * *
>
> Most of the deficits are from poor credit risks.  We know that, and we continue to accept their contracts without adequate reserves, and treat the excess discounted cash floe as certain profit to be distributed as we see fit. This is wrong.  I strongly believe that in a civil or criminal litigation we would lose badly on this point.  "We knew the poor collection history, and yet we continued to raise money as if we were ignorant of our own collection experience."

He suggested that they stop taking money:

> Distributions to Tim & Dave going forward should be eliminated.  Not only should these monies be set up as reserves for investor protection, but in future litigation, those distributions would be extremely detrimental to us.  Hard to justify investors losing ½ their money, while we continue to prosper at compensation levels that seem obscene to the average citizen sitting in judgement (sic).  This is a very personal issue for us, but I feel strongly about it.  You have larger financial commitments than I, and loss of distributions would be more of an impact.  I am in a position to help.  Let's talk.

He also suggested that they buy and sell recurring monthly revenues for fees and the spread:

> Another idea might be to start to establish ourselves as a broker.  Buy and sell RMR for fees and the spread.  Obviously, we would try to do as riskless transactions.  Maybe get brokers working not only to bring us product but to sell product as well.  Or better yet, make the purchases and sales within, in order to avoid paying brokerage costs and thus adding to our returns.

The admissions in this letter are very similar to the conduct charged in the superseding indictment, and the acts described appear to be part of a single criminal episode or were necessary preliminaries to the crimes charged here.   In the alternative, if the admissions are considered evidence of other crimes, then they are admissible as evidence of motive, intent, preparation, plan, knowledge, and absence of mistake.


E.      **The Admissibility of Prior Statements Made by the Defendants**

The defendants made relevant statements both before and after the original indictment was filed.  Those statements fall into several different categories: (1) pre-indictment statements made to others, both orally and in writing, outside of an investigative context, (2) pre-indictment statements given under oath to FINRA, and (3) post-indictment statements given under oath during depositions in the related civil case.   Most of these statements are admissible against both defendants.

1.      **Admissions of a Party Opponent**

Any prior statements made by each of the defendants is admissible against that defendant as an admission by a party opponent.  Fed. R. Evid. 801(d)(2)(A).  As a result, any statement by defendant Smith may be offered against defendant Smith, and any statement by defendant McGinn may be offered against defendant McGinn.   In addition, any statement made by both defendants, such as the October 10, 2009 handwritten memorandum from defendants McGinn and Smith to Gersten Savage attorney Jay Kaplowitz, is admissible against both defendants.    Finally, neither defendant may offer any of their statements because they are not the opposing party.

### 2.    Co-Conspirator Statements

Statements made by one or more of the co-conspirators, including the defendants, during and in furtherance of the conspiracy, are admissible as non-hearsay pursuant to Federal Rule of Evidence 801(d)(2)(E).  *See Bourjaily v. United States*, 483 U.S. 171 (1987) (co-conspirator statements admissible under Rule 801(d)(2)(E) where trial court finds that existence of conspiracy and defendant's participation therein are established by a preponderance of the evidence at trial).  *Crawford v. Washington*, 541 U.S. 36 (2004), has not affected this analysis because "the Supreme Court has indicated that statements in furtherance of a conspiracy are non-testimonial for purposes of the Confrontation Clause, and are therefore not covered by its protections."   *United States v. Shyne*, 617 F.3d 103, 108 (2d Cir. 2010).

Among the co-conspirator statements which the government intends to offer at trial are the statements made by the defendants under oath during the FINRA investigation. Although the defendants may assert that the statements should be excluded under *Crawford*, in the context of the conspiracy charged here, they are admissible.

As an initial matter, any portion of the statements which are false fall outside of

*Crawford*, and are admissible. *United States v. Stewart*, 433 F.3d 273, 291 (2d Cir. 2006). This is because *Crawford* does not apply to "evidence offered for purposes other than to establish the truth." *Id.* at 291.

The analysis for truthful portions of the statements is slightly different. The Second Circuit considered a similar situation in *Stewart*. There, the defendants were charged with offenses related to their efforts to obstruct an insider trading investigation, *id.* at 280, and the district court admitted evidence regarding statements that each of the two defendants had made during joint interviews conducted by the Securities and Exchange Commission, the U.S. Attorney's Office for the Southern District of New York, and the Federal Bureau of Investigation, *id.* at 281. On appeal, the defendants raised an unsuccessful *Crawford* challenge to the admission of those statements. *Id.* at 291. The Second Circuit concluded any true statements were admissible as co-conspirator statements. *Id.* at 291-93.

Although the Second Circuit acknowledged that "the statements at issue, having been made during interviews with government officials in the course of an investigation, do have characteristics of *Crawford's* 'core class of testimonial statements,' in the context of the crimes for which Defendants were convicted, the challenged statements are part and parcel of co-conspirators' statements made in the course of and in furtherance of Defendants' conspiratorial plan to mislead investigators."[5] *Id.* (quotations/citations

---

[5]The Supreme Court has not "spell[ed] out a comprehensive definition of 'testimonial,'" but it has "identified certain examples at the 'core' of the definition." *United States v. Stewart*, 433 F.3d 273, 290 (2d Cir. 2006) (quotations omitted). "[T]he types of statements cited by the Court as testimonial share certain characteristics; all involve a declarant's knowing responses to structured questioning in an investigative environment or a courtroom setting where the declarant would reasonably expect that his or her responses might be used in future judicial proceedings.'" *Id.* at 290 (quoting *United States v. Saget*, 377 F.3d 223, 228 (2d Cir. 2004)).

omitted).   The testimonial setting did not affect the admissibility of the "truthful portions of statements in furtherance of the conspiracy" because they were "intended to make the false portions believable and the obstruction effective." *Id.* at 292.   The reason for this rule is that "[s]tatements of co-conspirators are admissible on an agency theory," and "[i]t follows then that having formed their conspiracy to obstruct [the investigation, the co-defendants] each having full authority as an agent to speak for the other on matters within the purview of the conspiracy, answered questions on each other's behalf during the questioning by the Government's investigators and attorneys." *Id.* at 293.   As a result, "[t]he testimony by one . . . was as a matter of law the authorized statement of the other." *Id.* It does not matter whether the statements actually furthered the conspiracy; "it is enough that the statements were made with the *intent* to further the conspiracy's purpose." *Id.* at 293, n. 4.

Here, it is even less clear that the statements should be considered testimonial because they were given to an independent self-regulatory agency, not government investigators.   Even assuming, however, that the statements have a testimonial aura, they are admissible as co-conspirator statements.   The superseding indictment alleges that "a purpose of the conspiracy was to mislead investors and *FINRA* regarding the safekeeping and use of investor money by the Trusts, McGinn, Smith Transaction Funding Corp. ("MSTF"), and the Four Funds; the risks of the Trust, MSTF, and Four Fund offerings; the performance of the underlying income streams; the source of payments to investors; and the improper diversion of investor money; all done in order to obtain money from investors and enrich themselves."   Superseding Indictment ¶ 67 (emphasis added).   Like the defendants in *Stewart*, this conspiracy specifically charges the defendants with misleading FINRA.   As a result, the statements that they made to FINRA in furtherance of that

purpose are admissible as co-conspirator statements against both defendants.[6]

3.        **The SEC Depositions**

Like the FINRA statements, any false statements in the SEC depositions are admissible because they do not fall within *Crawford*'s protection.   To the extent that the depositions contain true statements, however, the United States does not intend to introduce those statements unless the defendant making the statement testifies at trial.

Dated:        November 8, 2012                Respectfully submitted,

                                              RICHARD S. HARTUNIAN
                                              UNITED STATES ATTORNEY


                              By:        */s/   Elizabeth C. Coombe*
                                              Elizabeth C. Coombe
                                              Richard D. Belliss
                                              Assistant U.S. Attorneys

---

[6]No limiting instruction is required here by *Bruton v. United States*, 391 U.S. 123 (1968) because statements of co-conspirators are admissible against all co-conspirators.

35